UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FRANK SIMMONS,

                    Plaintiff,

          v.

CAROLYN W. COLVIN,

                    Defendant.

DECISION AND ORDER
15-CV-6143

## Preliminary Statement

Plaintiff Frank Simmons brings this action pursuant to Title XVI of the Social Security Act (SSA) seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for supplemental security income. See Complaint (Docket # 1). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. See Docket ## 8, 13.

## Background and Procedural History

On July 13, 2011, plaintiff applied for disability insurance benefits, alleging an onset date of September 1, 2003. Administrative Record ("AR.") at 109—15. On January 19, 2012, plaintiff received a Notice of Disapproved Claim. AR. at 116—21. Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). AR. at 124—26. On May 3, 2013, a

hearing was held before ALJ Connor O'Brien.    AR. at 26—108. Plaintiff appeared at the hearing with his attorney, Ida M. Comerford.    Id.  On September 27, 2013, the ALJ issued a decision, determining that claimant was not disabled under section 1614(a)(3)(A) of the Social Security Act.  AR. at 11—20.  On October 16, 2013, plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council.  AR. at 6—7.  On January 15, 2015, the Appeals Council refused to review the ALJ's decision, making the ALJ's decision the final decision of the defendant Commissioner.  AR. at 1—5.  This federal lawsuit followed.

## Discussion

Plaintiff challenges the ALJ's decision on two grounds:
(1) the ALJ failed to find plaintiff disabled under Listing 12.05; and (2) the ALJ disregarded a treating physician's opinion regarding plaintiff's chronic low back pain and functional limitations.  See Plaintiff's Memorandum of Law (Docket # 8-1); Plaintiff's Reply (Docket # 14).    Because I find resolution of plaintiff's first argument to be dispositive, I need not address the second.

Plaintiff's Intellectual Functioning: Plaintiff's claim for SSI disability was initially denied on January 19, 2012.  AR. at 116. After the denial but before the hearing before ALJ Connor O'Brien, plaintiff was directed to meet with Kavitha Finnity, PhD, for a

2

psychological and intellectual assessment.     After meeting with plaintiff and administering standardized intellectual testing procedures, Dr. Finnity prepared a detailed six-page report setting forth plaintiff's test scores and her findings. AR. at 434-39.  The report was signed by Dr. Finnity on February 9, 2012, and included the results of standard intelligence (IQ) testing. The test results confirmed that plaintiff's full scale IQ was 55.

In addition to IQ testing, Dr. Finnity also assessed how plaintiff's intellectual functioning would impact his employability. As to the following categories of functional limitations, Dr. Finnity opined that plaintiff would be unable to function 50% of the time -- (1) performing complex tasks independently, (2) maintaining attention and concentration for rote tasks, (3) attending to a routine and maintaining a schedule, and (4) maintaining basic standards of hygiene and grooming. AR. at 437 (emphasis added).   Based on her assessments and the test administered, Dr. Finnity opined that plaintiff "appears permanently disabled, condition is not expected to improve and is unable to participate in any activities." AR. at 438. Dr. Finnity expounded her opinion as follows: "SSI referral is recommended based on the fact that the client is functioning in the mildly mentally retarded range of intelligence with an IQ score of

3

55.   He is also experiencing symptoms of depression and psychosis."[1]
Id.   It is important to note that the administrative record contains
no other IQ testing results nor any other intellectual assessments
aside from those of Dr. Finnity.

Listing 12.05:   A claimant may establish that he is disabled by
demonstrating at step three of the sequential evaluation process the
existence of a medically determinable, severe impairment that meets
or equals the criteria of an impairment found in the Listings.   See
20   C.F.R.   §§   416.920(a)   (4)(iii),   (d),   416.925,   416.926.   If
substantial accepted medical evidence from the record indicates that
a claimant meets a listing, that individual qualifies for disability
benefits without considering vocational factors.   20 C.F.R. Pt. 404,
Subpt. P, App. 1.   The purpose of the Listings is to streamline the
administrative process by identifying those impairments that are so
severe they would always be disabling.   See Bowen v. Yuckert, 482
U.S. 137, 153 (1987).

"Mental Retardation is listed as a *per se* disability in Appendix
1 of the relevant SSA regulations."   Talavera v. Astrue, 697 F.3d
145, 151 (2d Cir. 2012).   Listing 12.05 provides in relevant part:

---

[1]   Dr.   Finnity   noted   that   plaintiff   "reports   auditory
hallucinations."   AR. at 434.   Plaintiff testified about hearing
voices at his administrative hearing held on May 3, 2013.   AR.
at 52, 87-89.   He also referenced hallucinations in his adult
and childhood during visits to the Genesee Mental Health Center.
AR. at   491, 495-96.

> Mental retardation[2] refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied . . . .
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function[.]

20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 12.05. In other words, in order to be found disabled based on mental disability under section 12.05 of the Listing of Impairments, plaintiff must prove: (1) that he satisfies the definition provided for in the introductory paragraph of Section 12.05; and (2) that he satisfies the criteria listed in subsection A, B, C, or D. Id. at § 12.00A.

The introductory paragraph of Section 12.05 provides that a person suffers from mental retardation if he exhibits "significantly

---

[2] As of September 3, 2013 the Social Security Administration replaced the term "mental retardation" with "intellectual disability" in its Listing of Impairments to reflect the widespread adoption of the terminology change by Congress, government agencies, and various public and private organizations. See 78 Fed. Reg. 46499 (Aug. 1, 2013), https://www.gpo.gov/fdsys/pkg/FR-2013-08-01/html/2013-18552.htm. Because the ALJ's decision and the parties' briefs use the older terminology, the Court does as well.

subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." This paragraph, also referred to as the "capsule definition," is a requirement to meeting any of the severity listings found in Section 12.05. See Lyons v. Colvin, No. 7:13-CV-00614, 2014 WL 4826789, at *6 (N.D.N.Y. Sept. 29, 2014). To meet the capsule definition, plaintiff must show deficits in adaptive functioning prior to age twenty-two, and the deficits must be related to intellectual functioning, arising from "cognitive limitations, rather than from a physical ailment or other infirmity." Talavera v. Astrue, 697 F.3d at 153. A deficit in adaptive functioning "denotes an inability to cope with the challenges of ordinary everyday life." Barton v. Astrue, No. 3:08-CV-0810, 2009 WL 5067526, at *7 (N.D.N.Y. Dec. 16, 2009) (quoting Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007) (citing Diagnostic and Statistical Manual of Mental Disorders-IV 42 (4th ed. 2000))). "The term 'adaptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." POMS DI 24515.056D2; Lyons v. Colvin, 2014 WL 4826789 at *10. The American Psychiatric Association's criteria for mental retardation require deficits or impairments in adaptive functioning in two out of eleven areas. See DSM-IV 49 (4th ed. 2000)

(listing areas of adaptive functioning as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety). Although the Commissioner has not adopted the DSM-IV criteria, it is clear that plaintiff need not have complete lack of adaptive functioning to qualify as "deficient." Barton v. Astrue, 2009 WL 5067526 at *8; Ali v. Astrue, No. 09-CV-2123, 2010 WL 889550, at *5 (N.D.N.Y. March 8, 2010).

Importantly, and conceded by the Commissioner, a qualifying score from a valid IQ test given after the age of twenty-two is presumed to meet the capsule definition requirement of "subaverage general intellectual functioning with deficits in adaptive functioning." See Talavera v. Astrue, 697 F.3d at 152 ("It is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a fairly constant IQ throughout [their] li[ves].") (internal quotations omitted); See also Rivera v. Apfel, No. 98-CV-0619E F, 2000 WL 1568596, at *3 (W.D.N.Y. Sept. 29, 2000) ("[A]n IQ score is presumed to accurately reflect an individual's IQ throughout that person's entire life, regardless of the individual's age when the IQ test is administered.") (citing Holmes v. Apfel, No. 98 C 5087, 1999 WL 731769, at *5 (N.D. Ill. Aug. 31, 1999)).

Assuming a plaintiff's intellectual deficits meet the capsule

definition, he must also meet one of the four severity standards set forth in the subsections of 12.05. Subsection B provides that the intellectual deficit is sufficiently severe if plaintiff can demonstrate "[a] valid verbal, performance, or full scale IQ of 59 or less." 20. C.F.R. pt. 404, Subpt. P, App. 1, § 12.05B. "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided . . . we use the lowest of these in conjunction with 12.05." Id. at § 12.00(D)(6)(c). Unlike the capsule definition which requires a showing of subaverage intellect prior to age twenty-two, the IQ score in subsection B does not have an age requirement. Therefore, any valid IQ score, even a current one performed at age forty-six, and even a valid IQ score among other, higher IQ scores, suffices to meet subsection B's requirement. Here, plaintiff's recent IQ testing score of 55 clearly satisfies the requirement of 12.05B.

The ALJ's Decision: Based on the foregoing, in determining whether a disability applicant meets Listing 12.05B an ALJ must engage in the required two-step analysis. Here, the ALJ's analysis of the listing is difficult to decipher. The ALJ discussed the IQ score as follows:

> [T]he claimant's IQ testing reflected a full scale IQ of 55 as of February 9, 2012. The testing was done in conjunction with an

> examination for the Monroe County Department of
> Human Services, and does not reflect testing
> done during his education.
>
> While this is some evidence of IQ, this evidence
> does not affirmatively establish he had the
> lower IQ prior to age 22, as required by Listing
> 12.05. I give little weight to the assessment by
> Kavitha Finnity, Ph.D., who found that the
> claimant was mild [sic] mentally retarded. While
> the testing provides a basis for a rebuttable
> presumption for the lower IQ prior to age 22 [,]
> Listing 12.05C, Dr. Finnity's narrative notes
> that claimant's Verbal/Comprehension Index score
> is in the borderline range for abstract thinking
> skills, knowledge of vocabulary and acquired
> knowledge. Thus, the presumption is insufficient
> to establish the listing requirements. The
> claimant must make separate showings of deficits
> in cognitive and adaptive functioning. In other
> words, the IQ scores alone are not enough.
>
> Here, the IQ test results are not consistent
> with the claimant's performance of semi-skilled
> work or the claimant's adaptive functioning.
> Based on the discussion below at Finding 4, the
> evidence does not support a finding that the
> claimant's mental and physical impairments
> satisfy the requirements of Listing 12.05C.

AR. at 15.

Despite the fact that plaintiff's IQ score was severe enough to
meet subsection B, the only subsection of 12.05 discussed by the ALJ
in her decision is subsection C. When questioned on this discrepancy
during the motion hearing, counsel for the Commissioner argued that
the ALJ implicitly considered and rejected plaintiff's eligibility
for benefits under subsection B. According to the Commissioner,
because plaintiff's IQ score of 55 would satisfy the plaintiff's

burden in meeting both the capsule definition found in the introductory paragraph and the IQ threshold for subsection B, the ALJ's rejection of the plaintiff's IQ also necessarily addressed plaintiff's eligibility for benefits under subsection B. While the Court disagrees with the Commissioner's argument that the ALJ considered subsection B, in order to resolve plaintiff's claim without further delay the Court will consider the Commissioner's explanation and turn to its merits.

Even assuming the ALJ addressed subsection B, her discussion and analysis of the Listing 12.05 requirements is confusing. As stated earlier, the Commissioner conceded at oral argument that an IQ score that meets 12.05C would necessarily satisfy the capsule definition of "subaverage intellectual functioning with deficits in adaptive functioning" so long as the deficits "initially manifested" before age twenty-two. The Commissioner further agreed that there exists a presumption that a qualifying score from a valid IQ test given after the age of twenty-two is presumed to meet the capsule definition requirement because individuals experience a fairly constant IQ throughout their lives. See Talavara v. Astrue, 697 F.3d at 152. Thus, unless there is some reason to discredit plaintiff's IQ score, plaintiff's full scale IQ of 55 meets both the capsule definition and the severity requirement found in subsection B. According to the Commissioner, however, the ALJ's decision set forth substantial

evidence demonstrating that the plaintiff's IQ score did not accurately reflect plaintiff's true intellectual capabilities. The ALJ gave two reasons for doubting the validity of plaintiff's full scale IQ score. As set forth below, neither reason is supported by substantial evidence in the record.

"Borderline Range" Scores: Dr. Finnity's comprehensive assessment of plaintiff's intellectual capabilities included testing a range of cognitive deficits. Dr. Finnity reviewed all of the deficits identified in the testing scores and then, based on her training and experience, interpreted the results in arriving at her overall assessment of plaintiff's full scale IQ. In addition, Dr. Finnity's report set forth how, in her opinion, the cognitive impairments identified in the test results would impact plaintiff's ability to perform a job in a full-time, competitive employment environment.

The first reason given by the ALJ for discrediting plaintiff's full scale IQ score was the ALJ's interpretation of "narrative notes" found in Dr. Finnity's assessment of plaintiff's testing scores. Plaintiff received a Verbal/Comprehension Index IQ score of 68 and a perceptual/reasoning index of 63. AR. at 436. In her narrative notes, Dr. Finnity noted that plaintiff was in the "borderline range" for abstract thinking skills, knowledge of vocabulary and acquired knowledge. Id. The ALJ took that single statement as the basis to

11

find that the "presumption is insufficient to establish the listing requirement." AR at 15. The presumption the ALJ is referencing must be the presumption that a qualifying score from a valid IQ test given after the age of 22 meets the capsule definition requirement of "subaverage general intellectual functioning with deficits in adaptive functioning." Thus, it appears the ALJ interpreted the narrative notes in such a way as to constitute legitimate reasons to (1) reject the overall validity of the IQ testing and (2) determine that plaintiff was intellectually capable of competitive employment. This was error.

First, it is well established that even among multiple, varying IQ scores, the lowest score is to be considered with regards to Listing 12.05. See 20. C.F.R. pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c); see also Lyons v. Colvin, 2014 WL 4826789 at *11. If the ALJ was choosing to base her opinions on plaintiff's higher verbal or perceptual reasoning scores, that was clearly error. Second, unlike Dr. Finnity, the ALJ has no expertise or training in interpreting the cognitive significance of specific test scores. The ALJ apparently interpreted the narrative notes as proof that the full scale IQ score did not accurately reflect plaintiff's intellectual abilities, and that plaintiff was capable of full-time, competitive employment. On the other hand, Dr. Finnity, who met with the plaintiff and conducted the psychological assessment determined,

inter alia, that plaintiff had a "major depressive disorder with psychotic features" and possessed a full scale IQ of 55. Based on her training and experience, Dr. Finnity found plaintiff's cognitive limitations severe enough to make him unable to function in an employment setting 50% of the time, permanently disabled and not expected to improve. AR. at 437-38. An ALJ is "not at liberty to substitute his own lay interpretation of that diagnostic test for the uncontradicted testimony of [a medical professional], who is more qualified and better suited to opine as to the test's medical significance." Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); see Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("[T]he ALJ plainly did not choose between properly submitted medical opinions, but rather improperly set his own expertise against that of physicians who submitted opinions to him.")(internal quotation marks and brackets omitted); Vasquez-Ortiz v. Apfel, 48 F. Supp. 2d 250, 257 (W.D.N.Y. 1999)("The ALJ's rejection of Dr. Dickinson's [IQ] test results erroneously substitutes the ALJ's opinion for legally competent medical opinions. Under well-established Second Circuit case law, this is improper."). Here, the ALJ gave not a hint of why she interpreted Dr. Finnity's narrative statement regarding the various IQ scores to be so significant as to provide a basis to discredit the presumption that plaintiff has "subaverage general intellectual functioning with deficits in adaptive functioning."

While an ALJ is not required to accept IQ scores where the record contains substantial evidence that a claimant's IQ scores are not an accurate reflection of his true intellectual capabilities, it is not appropriate for an ALJ to reject the validity of an IQ score by offering her own opinion on the cognitive and vocational significance of selective testing scores.

The Commissioner argues that the ultimate determination of whether plaintiff is disabled is reserved for the Commissioner and not Dr. Finnity. This is, of course, true. See 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability."). However, it is equally true that interpreting cognitive test results and forming expert opinions based on those results is Dr. Finnity's job and not the ALJ's. Put differently, it is error for an ALJ to base a determination that a claimant's IQ score is not an accurate reflection of the claimant's true intellectual capabilities by relying on her own "expert" analysis as to the significance of certain selectively chosen scores found in "narrative notes." An ALJ's rejection of an otherwise valid IQ testing score must be based on something more than the ALJ's own interpretation of how a particular borderline test score translates into employability.

Semi-Skilled Work History: The second reason the ALJ gave for

14

rejecting the validity of plaintiff's qualifying IQ score was that the "IQ test results were not consistent with the claimant's performance of semi-skilled work." AR. at 15. Counsel for the Commissioner stated at the motion hearing that while he was sympathetic to plaintiff's obvious cognitive limitations, the fact remained that plaintiff's past work history included semi-skilled work and, that fact, standing alone, was enough to discredit the results of plaintiff's IQ test. I disagree. The plaintiff's ability to do semi-skilled work must still be supported by substantial evidence. Relying on plaintiff's past employment as the lone reason to discard his IQ test is not legitimate if the employment is a mirage. As the record and hearing testimony confirm, plaintiff's "semi-skilled work history" consists of being placed by several temporary employment agencies at jobs usually only lasting a few days. AR. at 95-98, 100. Plaintiff's employment income record corroborates the fleeting nature of plaintiff's previous jobs. The hearing transcript reflects that even the vocational expert had difficulty ascertaining the nature of plaintiff's past employment or the income that he had earned. AR. at 42-46, 95-100. For instance, plaintiff earned $486.00 in January 2003, a time at which he stated that he was working full time, i.e. eight hour shifts and five days a week. AR. at 43. The VE testified that substantial gainful activity in 2003 was $800, but plaintiff could not explain his low income,

15

other than asserting that he was not paid under the table. AR. at 44. Likewise, plaintiff's total earnings in 2002 were $1,142. AR. at 45. It is impossible to glean from the record what type of employment plaintiff was doing, and what skill level and for what length of time.

When asked at the oral argument whether these transient engagements in the labor market could constitute substantial evidence that plaintiff has a work history that includes the successful performance of semi-skilled work, counsel for the Commissioner pointed to plaintiff's hearing testimony which included his assertion that he had never been fired from a job. AR. at 100. It is always difficult to evaluate the reliability of testimony from a cold transcript, but even counsel for the Commissioner did not disagree with this Court's observation that a fair reading of plaintiff's hearing testimony before the ALJ revealed an individual who had difficulty answering the simplest of questions, was largely unfocused and rambling during the hearing, and whose memory as to even basic historical facts was suspect. Given his obvious cognitive limitations, which were readily apparent from the hearing transcript, plaintiff's testimony proudly declaring that he had never been fired from a job is not substantial evidence that he is capable of being gainfully employed in a semi-skilled job.

More fundamentally, however, it simply cannot be that occasional

16

placement in a semi-skilled job through a temporary employment agency for a few days at a time constitutes substantial evidence of cognitive functioning sufficient to rebut the presumption created by a valid IQ test. Contrary to the argument of the Commissioner, the relevant issue is not whether plaintiff can be placed for a few days in a semi-skilled job, but whether plaintiff has the intellectual capabilities to be successful in a full-time, competitive semi-skilled employment environment. Rejection of an otherwise valid IQ score might be justified if the record contained credible evidence that, despite his intellectual limitations, plaintiff had a work history that included meaningful and successful employment in a semi-skilled job. But the record here lacks any reliable evidence, let alone substantial evidence, to justify a finding that plaintiff is intellectually capable of competitive employment in a semi-skilled occupation.

An ALJ may discredit an otherwise valid IQ score when the reported score does not accurately reflect plaintiff's true intellectual capabilities. A fair reading of the record here does not support the ALJ's rejection of plaintiff's IQ score. Conversely, there is substantial evidence in the record that plaintiff's test score is fully consistent with the plaintiff's limited prior work history, his placement in special education classes as a child, his daily activities, his behavior at the hearing and other aspects of

17

his life. Thus, the ALJ's determination at step three that plaintiff failed to meet the 12.05B listing requirements was error.

Disposition: Under 42 U.S.C. § 405(g), district courts have the authority to affirm, reverse, or modify a decision of the Commissioner with or without remanding the case for hearing. See, e.g., Butts v. Barnhart, 288 F.3d 377, 385-87 (2d Cir. 2002). Remand for further proceedings is appropriate where there are gaps in the administrative record or the ALJ has applied an improper legal standard and further findings would "so plainly help to assure the proper disposition of [the] claim[s]." Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999); See also, Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996); Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). By contrast, "where this Court has no apparent basis to conclude that a more complete record might support the Commissioner's decision," it is appropriate to remand for a calculation of benefits. Rosa, 168 F.3d at 83. In other words, a court should order the payment of benefits when a remand for further proceedings is unnecessary because the record contains persuasive proof of disability. Burton v. Colvin, No. 6:12-CV-6347, 2014 WL 2452952, at *13 (W.D.N.Y. June 2, 2014) (citing Carroll v. Secretary of Health and Human Serv., 705 F.2d 638, 644 (2d Cir. 1981).

Here, there is no indication that a broader record would support the Commissioner's decision. The Commissioner's finding that plaintiff does not qualify as disabled at step three is not supported

by substantial evidence.   To the contrary, the record is clear that plaintiff qualifies as disabled under Listing 12.05B. Because there are no outstanding issues needing resolution before a determination of disability can be made, the Court finds that it is appropriate to remand the matter to the Commissioner for a calculation of disability benefits only.

## Conclusion

For the reasons set forth above, the defendant's motion for judgment on the pleadings (Docket # 13) is **denied** and the plaintiff's motion for judgment on the pleadings (Docket # 8) is **granted** and the matter is remanded to the Commissioner for the calculation of benefits beginning from July 13, 2011, the date of plaintiff's initial application for benefits.   See 20 C.F.R. § 416.325(a).

SO ORDERED.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:      July 13, 2016
            Rochester, New York

19